**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**October 7, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP1552**

**STATE OF WISCONSIN**

Cir. Ct. No.  **2020CV121**

**IN COURT OF APPEALS**
**DISTRICT IV**

RAPID DIE AND MOLDING CO.,

   PLAINTIFF-APPELLANT,

V.

ROYAL BANCSHARES INC.,

   DEFENDANT-RESPONDENT.

APPEAL from an order of the circuit court for Grant County: ROBERT P. VAN DE HEY, Judge. *Affirmed*.

Before Fitzpatrick, Graham, and Nashold, JJ.

¶1    FITZPATRICK, J.   Rapid Die and Molding Co. appeals an order of the Grant County Circuit Court dismissing its claims against Royal Bancshares,

Inc.[1]  One of RDM's employees stole funds from the business checking account that RDM maintained with Royal Bank.  RDM's complaint alleged that Royal Bank is liable for the stolen funds because:  (1) Royal Bank breached the parties' contract regarding the terms of the checking account; and (2) Royal Bank was negligent in that Royal Bank "breached its duty to act with reasonable care to protect RDM's funds" in that account.

¶2      In response, Royal Bank filed in the circuit court motions to dismiss RDM's causes of action for failure to state a claim upon which relief can be granted.  Royal Bank argued that the complaint did not allege facts to plausibly suggest that Royal Bank breached its contract with RDM and that RDM's negligence claim is barred by Wisconsin's version of the Uniform Fiduciaries Act.[2]  The circuit court granted Royal Bank's motion on each claim and dismissed RDM's complaint without prejudice to RDM filing an amended complaint on RDM's second cause of action.  RDM appeals.

¶3      For the reasons that follow, we affirm the circuit court's order.

## BACKGROUND

¶4      The following facts are taken from the complaint.  All well-pleaded facts in a complaint must be accepted as true on a motion to dismiss.  *Cattau v. National Ins. Servs. of Wis.*, 2019 WI 46, ¶4, 386 Wis. 2d 515, 926 N.W.2d 756.

---

[1]  For convenience, we refer to the parties as "RDM" and "Royal Bank."

[2]  Wisconsin's version of the Uniform Fiduciaries Act is codified at WIS. STAT. § 112.01 (2019-20).  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶5      RDM is an Illinois corporation that manufacturers loudspeaker components in Cassville, Wisconsin. Royal Bank is a Wisconsin corporation with its principal place of business in Elroy, Wisconsin.

¶6      RDM maintained its primary business checking account ("the account") with Royal Bank. RDM and Royal Bank entered into a written agreement that set forth the terms and conditions of the account ("the agreement"). The relevant terms of the agreement will be discussed later in this opinion.

¶7      RDM's owner discovered that Curtis Tarver, one of RDM's employees, was stealing from the account for at least twelve years "through a series of unauthorized electronic debit transactions, among other strategies."[3] Tarver was a manager with authority to perform financial transactions for RDM and was a signatory on the account. However, RDM did not authorize Tarver to transfer RDM's funds in the account to himself or to others for his own benefit or interests.

¶8      One "scheme[]" Tarver used to steal money from RDM was to set up, without authorization from RDM, a PayPal[4] business account in RDM's name and use the account at Royal Bank to fund the PayPal account. Tarver then

---

[3] The complaint does not give any detail about Tarver's "other strategies" to steal money from RDM, and the parties do not argue in this court that Tarver's other strategies make a difference to the result. So, like the parties, we ignore Tarver's purported other strategies used to steal money from RDM.

[4] "PayPal is an online payment service that allows a business or private individual to send and receive payments via the Internet. A PayPal account holder sends money by informing PayPal of the intended recipient[] … and the amount to be sent and by designating a funding source such as a credit card, bank account or separate PayPal account. PayPal accesses the funds and immediately makes them available to the intended recipient." *Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1165, 1166 (N.D. Cal. 2002).

3

instructed PayPal to transfer RDM's funds to his own personal accounts and to Tarver's third-party vendors and creditors. RDM estimates that Tarver stole over $650,000. Tarver has since pled guilty to wire fraud and began serving a sentence in federal prison in January 2020.

¶9 RDM describes in the complaint what it refers to as "red flags" that should have raised Royal Bank's suspicion about Tarver's misconduct. More specifically, we read the complaint to state that, at least in some instances, the information in Royal Bank's "transaction detail reports" would have allowed Royal Bank to infer that the money transferred from the account to PayPal would go to Tarver's own personal accounts and to Tarver's third-party vendors and creditors. These red flags will be described in greater detail later in this opinion. At no point did Royal Bank notify RDM of any suspicious activity on the account.

¶10 As noted, RDM filed a complaint against Royal Bank alleging both breach of contract and negligence. Royal Bank filed motions to dismiss for failure to state a claim upon which relief can be granted, arguing that: (1) there was no breach of contract because Royal Bank acted consistently with the terms of the parties' agreement; and (2) the Uniform Fiduciaries Act ("UFA") bars RDM's negligence claim. The circuit court issued an initial decision and order in which the court dismissed RDM's breach of contract claim. After supplemental briefing, the circuit court issued a second decision and order that dismissed RDM's negligence claim without prejudice to RDM's ability to file an amended complaint regarding that second cause of action. RDM appeals.

## DISCUSSION

¶11 RDM makes two principal arguments on appeal. First, RDM argues that it has sufficiently pled facts which show that Royal Bank breached the parties'

agreement. Second, RDM argues that the UFA does not bar RDM's negligence claim. In the alternative, RDM contends that the complaint sufficiently states a claim for lack of "good faith" against Royal Bank under the UFA. Each argument is addressed in turn.

### I.  Standard of Review on a Motion to Dismiss.

¶12    A party may file a motion to dismiss on the ground that the complaint fails to state a claim upon which relief can be granted. WIS. STAT. § 802.06(2)(a)6. We review de novo a circuit court's order granting a defendant's motion to dismiss. *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶17, 356 Wis. 2d 665, 849 N.W.2d 693.

¶13    In determining whether a party has stated a claim, we are concerned only with the legal sufficiency of the complaint. *Id.*, ¶19. "[A] complaint must plead facts, which if true, would entitle the plaintiff to relief." *Data Key*, 356 Wis. 2d 665, ¶21. "[T]he sufficiency of a complaint depends on substantive law that underlies the claim made because it is the substantive law that drives what facts must be pled." *Cattau*, 386 Wis. 2d 515, ¶6 (quoting *Data Key*, 356 Wis. 2d 665, ¶31).

¶14    We accept as true all factual allegations in a plaintiff's complaint as well as "reasonable inferences therefrom." *Id.*, ¶4. We do not add facts in the process of construing a complaint and do not accept as true legal conclusions in the complaint. *Id.*, ¶5.

¶15    "[W]hen a document is attached to the complaint and made part thereof, it must be considered a part of the pleading, and may be resorted to in determining the sufficiency of the pleadings." *Peterson v. Volkswagen of Am.,*

5

*Inc.*, 2005 WI 61, ¶15, 281 Wis. 2d 39, 697 N.W.2d 61 (quoting *Friends of Kenwood v. Green*, 2000 WI App 217, ¶11, 239 Wis. 2d 78, 619 N.W.2d 271). However, a document attached to a party's brief concerning a motion to dismiss is generally not considered part of the complaint and will not be considered on a motion to dismiss. *Id.*, ¶15 n.8. Therefore, we will consider as part of our analysis the parties' agreement attached to RDM's complaint.[5] However, we will not consider the "certification" from a person RDM refers to as an "expert" which was attached to RDM's brief filed in the circuit court in opposition to Royal Bank's motion to dismiss.[6]

## II. Breach of Contract Claim.

¶16　We now turn to RDM's claim that Royal Bank breached the parties' agreement.

---

[5] The parties do not dispute the pertinent language of the agreement. This is fortunate because we cannot discern each word on the agreement attached to the complaint either with a magnifying glass or at maximum magnification in the electronic record. We remind counsel to provide legible copies of exhibits for the record.

[6] We note that WIS. STAT. § 802.06(2)(b) provides, in pertinent part:

> If on a motion asserting the defense described in par. (a)6. to dismiss for failure of the pleading to state a claim upon which relief can be granted, or on a motion asserting the defenses described in par. (a)8. or 9., *matters outside of the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in* [WIS. STAT. §] *802.08*, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by s. 802.08.

(Emphasis added.) Here, as noted, RDM attached the certification to its brief in opposition to Royal Bank's motion to dismiss. As did the circuit court, we treat Royal Bank's motion as a motion to dismiss for failure to state a claim and not one for summary judgment. *See Peterson v. Volkswagen of Am., Inc.*, 2005 WI 61, ¶15 n.8, 281 Wis. 2d 39, 697 N.W.2d 61.

### A. Governing Principles and Standard of Review.

¶17 "The primary goal in contract interpretation is to give effect to the parties' intentions." *Seitzinger v. Community Health Network*, 2004 WI 28, ¶22, 270 Wis. 2d 1, 676 N.W.2d 426. We ascertain the parties' intentions by looking to the language of the contract itself. *Id.* "Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms." *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶23, 326 Wis. 2d 300, 786 N.W.2d 15 (quoting *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998)). "A construction which gives reasonable meaning to every provision of a contract is preferable to one leaving part of the language useless or meaningless." *Maas v. Ziegler*, 172 Wis. 2d 70, 79, 492 N.W.2d 621 (1992).

¶18 Whether contract terms are plain or ambiguous is a question of law, which we review de novo. *Converting/Biophile Lab'ys, Inc. v. Ludlow Composites Corp.*, 2006 WI App 187, ¶33, 296 Wis. 2d 273, 722 N.W.2d 633.

¶19 A complaint states a claim for breach of contract when it alleges: (1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3) damages. *Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 2006 WI App 39, ¶11, 289 Wis. 2d 795, 714 N.W.2d 582, *aff'd* 2006 WI 128, 297 Wis. 2d 606, 724 N.W.2d 879.

### B. The Complaint Does Not State a Claim for Breach of Contract.

¶20 RDM argues that Royal Bank breached its contractual duty to RDM by allowing electronic debits from the account that were "not authorized."

Pertinent language in the agreement is within the "Withdrawals" heading and states:

> Unless otherwise clearly indicated on the account records, any one of you who signs this form including authorized agent signers, may withdraw or transfer all or any part of the account balance at any time on forms approved by us.… We reserve the right to refuse any withdrawal or transfer request which is attempted by any method not specifically permitted …. Even if we honor a nonconforming request, repeated abuse of the stated limitations (if any) may eventually force us to close this account.

RDM does not dispute that, for the purpose of analyzing its breach of contract claim, Tarver was authorized to withdraw or transfer funds out of the account. Rather, we understand RDM's argument to be that Royal Bank breached the agreement because the electronic debits Tarver used to transfer funds from the account were not authorized by the terms of the agreement. We next address and reject each of RDM's arguments.

### 1. The Transactions Occurred on Forms Approved by Royal Bank.

¶21    First, RDM argues that the phrase in the agreement "on forms approved by [Royal Bank]" requires that withdrawals or transfers from the account occur "on forms specifically approved in advance [by Royal Bank]."[7] RDM also contends that the complaint sufficiently alleges that the disputed transactions did not occur on such forms.

---

[7] At one point in briefing in this court, RDM argues that transactions must occur "on forms provided by Royal Bank." This argument incorrectly changes the words "approved by" into the words "provided by." The agreement contemplates that the withdrawal or transfer may be accomplished using forms "approved by" Royal Bank; it does not require that Royal Bank be the entity providing any such forms.

¶22 As noted above, to properly plead a claim for breach of contract, a complaint must allege facts showing the "failure of the defendant to do what it undertook to do" in the contract. *Brew City*, 289 Wis. 2d 795, ¶11. Further, when determining whether a claim for relief is properly pled, our decision is controlled by "the sufficiency of the facts alleged" in the complaint. *Data Key*, 356 Wis. 2d 665, ¶21 (citing *Strid v. Converse*, 111 Wis. 2d 418, 422-23, 331 N.W.2d 350 (1983)). Here, the complaint fails to allege sufficient facts to show that the disputed withdrawals or transfers did not occur on "forms approved by [Royal Bank]."[8] None of the facts alleged in the complaint indicate the type of form used, and the complaint does not explicitly state whether the withdrawals or transfers used a form at all. Nonetheless, the complaint suggests that there was some kind of form used for the withdrawals or transfers with various "fields" denominated as "customer," "company," "transaction," and "receiver." The complaint also fails to indicate that Royal Bank did not "approve" any such form. As a result, even if the agreement required Royal Bank to process withdrawals or transfers only on "forms approved by [Royal Bank]," the complaint provides no basis to conclude that Royal Bank breached that duty.

---

[8] The parties appear to adopt different interpretations of the phrase "on forms approved by [Royal Bank]." RDM argues that this phrase suggests that the word "form" as used in the agreement should be interpreted to mean "a written form" or "the document on which the transaction is processed." Conversely, one of Royal Bank's arguments suggests that the word "form" means "the form of the transaction" or "the method or procedure by which the transaction occurs." We conclude that this phrase in the agreement is not ambiguous and addresses transactions that occur on some sort of document, template, or other form of writing that Royal Bank has approved. Contrary to Royal Bank's suggestion, the phrase cannot reasonably be interpreted to mean "a form of transaction approved by Royal Bank" because the phrase addresses transactions that occur "on" forms. We apply this meaning of the phrase in our analysis in the main text.

¶23 In addition, even if the complaint had alleged facts indicating the type of form on which the transactions occurred and that this type of form was not "approved by [Royal Bank]," the complaint would still not state a claim that Royal Bank breached its contractual obligation because the agreement does not *require* withdrawals or transfers to occur on forms approved by Royal Bank. Instead, the agreement states that "any one of you who signs this form including authorized agent signers, *may* withdraw or transfer all or any part of the account balance at any time on forms approved by [Royal Bank]." (Emphasis added.) By using the word "may" instead of "must," the agreement indicates that the phrase "on forms approved by [Royal Bank]" is not the only process by which funds may be withdrawn or transferred from the account. The agreement confirms this interpretation by further stating that Royal Bank "reserve[s] the right to refuse any withdrawal or transfer request which is attempted by *any method not specifically permitted*" and that Royal Bank may "honor a nonconforming request." (Emphasis added.) These provisions bolster the conclusion that the agreement sets forth a process by which such transactions may occur, but that it would not be a breach of the agreement if such transactions occurred by another process that is not specifically delineated in the agreement.

2. The Agreement Authorizes the Electronic ACH Debits Made by Tarver.

¶24 Second, RDM argues that Royal Bank breached the agreement because electronic debits from the account do not qualify as "withdrawals" or

"transfers," and are not otherwise contemplated by the agreement.[9] RDM contends that the meanings of the terms "withdrawals" and "transfers" under the "Withdrawals" heading in the agreement are informed by the provision of the agreement located under the "ACH and Wire Transfer" heading in the agreement. The "ACH and Wire Transfer" provision states in pertinent part:

> This agreement is subject to Article 4A of the Uniform Commercial Code in the state in which you have your account with us.… You agree to be bound by automated clearing house association rules.

Both parties agree that the debits at issue are not covered by Article 4A of the Uniform Commercial Code ("Article 4A") because Article 4A only addresses credits. The parties also agree that electronic debits are covered by the Automated Clearing House Association ("ACH Association") rules because those rules address both "credits" and "debits." *See, e.g.*, ***Costoso v. Bank of America, N.A.***, 74 F. Supp. 3d 558, 570-71 (E.D.N.Y. 2015).

¶25 To the extent we understand RDM's argument, it appears to contend that the above-quoted language from the ACH and Wire Transfer provision of the agreement demonstrates that electronic debits are not authorized by the agreement for two reasons: (1) the reference to Article 4A excludes debits from the scope of the agreement; and (2) the reference to the ACH Association rules could address either credits or debits, so it "does not tell us anything about whether credits or debits are the subject of this paragraph of the Agreement."

---

[9] The complaint refers to a "scheme[]" used by Tarver through PayPal along with more ambiguous references to "electronic debits." RDM's briefing in this court refers to "debit transfers" through PayPal "and other third parties." RDM does not assert that any electronic debits through third parties other than PayPal have features separate than those of PayPal that make any difference to the result in this appeal.

¶26 We reject RDM's reasoning and conclude that the debits at issue in this case are "withdrawals" or "transfers" within the terms of the agreement. First, RDM does not dispute that these debits qualify as "transfers" under the agreement. Indeed, in the complaint, RDM alleged that Tarver instructed PayPal to "transfer" RDM's funds and described the purported "red flag" transactions as "transfers." Second, these debits are not excluded from the meaning of "withdrawals" or "transfers" simply because the agreement is subject to Article 4A. If we were to interpret the agreement's reference to Article 4A as restricting the scope of the entire agreement to credits, we would render meaningless the agreement's subsequent reference to the ACH Association rules which address electronic ACH debits, and that would be an improper interpretation of the agreement. *See Maas*, 172 Wis. 2d at 79 ("A construction which gives reasonable meaning to every provision of a contract is preferable to one leaving part of the language useless or meaningless."). Therefore, the complaint fails to state a claim that Royal Bank breached its contractual duty not to allow electronic debits from the account.

### 3. Tarver Performed the Transactions.

¶27 Third, RDM argues that Royal Bank breached the agreement based on the following string of propositions advanced on appeal, each of which is necessary to this argument from RDM. Tarver did not give any "instructions" to Royal Bank to pay out RDM's funds "in the account." Instead, the "electronic ACH debit[s]" were "originated by PayPal" "to the account of RDM." The agreement authorized Tarver to withdraw funds but because the ACH debit entries were "originated" by PayPal—a third party—Royal Bank did not have authority under the agreement "to pay out RDM's funds" in the transactions described in the complaint.

¶28    For the following reasons, either of which is sufficient to reject RDM's argument, we conclude that the complaint does not state a claim that Royal Bank breached the agreement in these circumstances.  Initially, RDM does not allege in the complaint that Royal Bank breached the agreement by allowing PayPal to withdraw or transfer funds out of the account.  Next, Tarver had the authority under the agreement to transfer funds from the account.  Tarver initiated the transfers and directed PayPal's actions.  In other words, Royal Bank did not allow an "unauthorized" party (PayPal) to transfer funds from the account.  The transactions were controlled by Tarver, a signatory to the account.  Therefore, RDM's complaint does not sufficiently allege that Royal Bank breached the agreement for this reason.

¶29    In sum, we conclude that the complaint fails to state a claim that Royal Bank breached the agreement.  We affirm the circuit court's order concerning this cause of action.  After remittitur, the circuit court may rule on any request by RDM to file an amended complaint regarding breach of contract by Royal Bank.  We next turn to RDM's negligence claim.

### III.  RDM's Negligence Claim.

¶30    RDM argues that Royal Bank negligently failed to protect the funds in the account because Royal Bank allowed Tarver's debits from the account, failed to adequately monitor the account for suspicious activity, and failed to notify RDM of suspicious activity.  Royal Bank responds that WIS. STAT. § 112.01(3)—a subpart of Wisconsin's version of the UFA—applies to these disputed transactions and bars RDM's claim.  We now consider whether the UFA applies to RDM's claim.

13

## A. Standard of Review and Statutory Interpretation.

¶31    The parties' arguments require us to interpret statutes. "Statutory interpretation and the application of a statute to a given set of facts are questions of law that we review independently." *Marder v. Board of Regents of Univ. of Wis. Sys.*, 2005 WI 159, ¶19, 286 Wis. 2d 252, 706 N.W.2d 110. Statutory interpretation "begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry. Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (internal citations omitted).

## B. The UFA Applies to RDM's Claim.

¶32    WISCONSIN STAT. § 112.01(3) states in pertinent part:

> **(3) Application of payments made to fiduciaries.**
> A person who in good faith pays or transfers to a fiduciary any money or other property which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary; and any right or title acquired from the fiduciary in consideration of such payment or transfer is not invalid in consequence of a misapplication by the fiduciary.

Sec. 112.01(3).[10]   RDM argues that this provision of the UFA does not apply in these circumstances for three reasons: (1) Tarver was not a "fiduciary" as defined in the UFA because he was not an "officer" of RDM; (2) for this subpart of the

---

[10] This section is identical to § 2 of the Uniform Fiduciaries Act. *See* UNIF. FIDUCIARIES ACT § 2 (UNIF. L. COMM'N 1922). In addition, we note that RDM does not dispute that Royal Bank is a "person" as mentioned in WIS. STAT. § 112.01(3).

UFA to apply, Royal Bank must "pay" or "transfer" money directly to Tarver, rather than through a third party such as PayPal; and (3) Tarver was not "authorized to receive" the funds because RDM did not authorize Tarver to receive the transfers of money from the account. Each argument is addressed, and rejected, below.

1. Tarver Was a "Fiduciary."

¶33 RDM argues that Tarver did not qualify as a "fiduciary" under the UFA which defines "fiduciary" as follows:

> **(1) Definitions.** … (b) "Fiduciary" includes a … partner, *agent*, officer of a corporation, public or private, public officer, or any other person acting in a fiduciary capacity for any person, trust, or estate.

WIS. STAT. § 112.01(1)(b) (emphasis added). RDM acknowledges that Tarver was its "agent." Further, RDM's complaint states that Tarver was a manager with authority to perform financial transactions for RDM, and RDM admits in briefing in this court that Tarver was "an agent with authority to act for RDM with regard to certain financial transactions." Nonetheless, RDM contends that an "agent" under the UFA is not a "fiduciary" unless that agent is also an "officer" of the corporation. RDM contends that if "every employee of a corporation were an agent within the meaning of the UFA, then there would be no reason for the words: 'officer of a corporation.'"

¶34 RDM's argument misinterprets WIS. STAT. § 112.01(1)(b). That statutory subpart lists the types of persons who qualify as fiduciaries in the disjunctive, such that the term "fiduciary" includes an "agent" *or* an "officer" of a corporation. *Id.* RDM attempts to change the meaning of the subpart when it argues that a fiduciary must be both an "agent" and an "officer." Moreover, the

15

term "agent" does not include all employees of a corporation because "agent" denotes the authority "to act for or in place of another." *Agent*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also **Meyers v. Matthews***, 270 Wis. 453, 467, 71 N.W.2d 368 (1955) (an agent is a "person authorized by another to act on his account"). An employee of a corporation who does not have the authority to represent or act in the place of the corporation would not be considered an "agent" under § 112.01(1)(b).

¶35 Therefore, Tarver was an "agent" under WIS. STAT. § 112.01(1)(b) and thus a "fiduciary" pursuant to § 112.01(3).

### 2. Royal Bank Transferred Money "to" Tarver.

¶36 Next, in an abbreviated argument, RDM contends that WIS. STAT. § 112.01(3) does not apply to these transactions because that statutory subpart addresses payments or transfers made "to" a fiduciary. RDM asserts that Royal Bank did not pay or transfer funds directly "to" Tarver because Royal Bank transferred the funds to PayPal which then transferred the funds to Tarver's payees, including his own personal accounts.

¶37 RDM's interpretation of WIS. STAT. § 112.01(3) is too narrow. RDM's interpretation of the statute impermissibly adds the word "directly" to the phrase "pays or transfers to a fiduciary." *See **State v. Neill***, 2020 WI 15, ¶23, 390 Wis. 2d 248, 938 N.W.2d 521 ("One of the maxims of statutory construction is that courts should not add words to a statute to give it a certain meaning."). Under RDM's narrow interpretation of the statute, the UFA would not apply when a fiduciary simply transferred funds from the principal's account at one bank to the fiduciary's account at another bank because there was an intermediary or a clearing house to electronically transfer funds. In fact, according to the complaint,

Royal Bank transferred funds "to" Tarver because Tarver initiated the transactions and directed the acts that transferred funds to accounts that were his accounts or that he controlled. Therefore, we conclude that Royal Bank transferred funds "to" Tarver under § 112.01(3).

### 3. Tarver was "Authorized to Receive" the Transfers.

¶38 RDM next argues that WIS. STAT. § 112.01(3) does not apply to these transactions because Tarver was not, as required by that statutory subpart, "authorized to receive" the transfers of money from the account. Royal Bank responds that Tarver was "authorized to receive" the transfers from the account because Tarver had the authority to perform financial transactions for RDM, Tarver was a signatory on RDM's account with Royal Bank, and the agreement authorized such signatories to "withdraw or transfer all or any part of the account balance at any time."

¶39 The meaning of the phrase "authorized to receive" as used in WIS. STAT. § 112.01(3) has been addressed by courts in other states that have adopted the UFA.[11] These courts have interpreted this phrase as requiring that the fiduciary obtain authorization from the principal to conduct the transaction at issue. *See, e.g.*, ***Mutual Serv. Cas. Ins. Co. v. Elizabeth State Bank***, 265 F.3d 601, 624 (7th Cir. 2001) ("[The 'authorized to receive'] language reiterates the need to focus on the agent's authority with respect to the particular transaction at

---

[11] The parties do not identify—and our research does not reveal—any Wisconsin case law examining the scope of this language. Nevertheless, because WIS. STAT. § 112.01 is a uniform law, we may consider decisions from other jurisdictions. Sec. 112.01(14) ("This section shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it."); *see also* ***Koss Corp. v. Park Bank***, 2019 WI 7, ¶¶33, 82, 385 Wis. 2d 261, 922 N.W.2d 20 (relying on case law from other states in light of § 112.01(14)).

issue."); ***Zions First Nat'l Bank v. Clark Clinic Corp.***, 762 P.2d 1090, 1100-01 (Utah 1988) ("In other words, for the Uniform Fiduciaries Act to apply to this case, Westover must have been a fiduciary who was *authorized or empowered in fact* to endorse and/or sign the subject instruments and checks."); ***Master Chem. Corp. v. Inkrott***, 563 N.E.2d 26, 30 (Ohio 1990) (holding that part of this inquiry is "whether the fiduciary in fact possessed the authority to conduct the transaction in question").  Contrary to RDM's argument, a fiduciary may still be "authorized to receive" funds under § 112.01(3) even when those funds are withdrawn for the fiduciary's personal benefit.

¶40     That point is illustrated by the analysis in the ***Elizabeth State Bank*** case.  In that case, Hemmen (the company's controller) was not a signatory to the company's operating account and did not have authority to withdraw funds from that account.  ***Elizabeth State Bank***, 265 F.3d at 606-07.  Nevertheless, Hemmen had authority to prepare checks drawn on the operating account to pay the company's suppliers and to transfer funds to the company's other accounts.  ***Id.*** at 607.  Hemmen used these checks to embezzle over $80,000 from the company in the following manner.  ***Id.***  Hemmen prepared a check on the company's operating account payable to the bank.  ***Id.***  He then presented the check to the company's general manager for signature.  ***Id.***  The general manager assumed the check was written to legitimately transfer funds to the company's other accounts.  ***Id.***  In reality, however, Hemmen would present the check to the teller at the bank and request that a portion of the balance be disbursed to himself in the form of cash or cashier's checks.  ***Id.***  Even though the bank knew that Hemmen was not a signatory, the bank acceded to his requests without first consulting with the company regarding his authority to receive the proceeds of the checks.  ***Id.*** at 608.

¶41    The Seventh Circuit held that Hemmen was not "authorized to receive" the funds at issue under the UFA.[12]  *Id.* at 625.  The court noted that the key consideration on this question is that the UFA "will not absolve the bank of liability for the presenter's misapplication of the check proceeds unless the evidence reveals that he was authorized to receive those proceeds."  *Id.* at 624. Hemmen was not "authorized to receive" the funds because:

> [N]o evidence demonstrates that Hemmen was ever given broad authority to receive cash on checks drawn to the bank's order, or to divert funds from the operating account to anywhere but the [company's other] accounts, and it is Hemmen's lack of authority in this regard that precludes the bank's resort to [the UFA].

*Id.* at 625.  In other words, although Hemmen had the authority to move funds from the operating account to other accounts at the bank, he was not "authorized to receive" funds because he was not a signatory on the account and had no authority to move the funds from the operating account to himself.  *Id.* ("[W]hat is key is his authority to have funds from the operating account issued to himself.").

¶42    The Seventh Circuit compared the facts of Hemmen's embezzlement to those in *St. Stephen's Evangelical Lutheran Church v. Seaway National Bank*, 350 N.E.2d 128 (Ill. App. Ct. 1976).  In that case, the agreement between the church and the bank designated Ferguson (the church's bookkeeper) as the only signatory on the account and authorized the bank to honor checks drawn to Ferguson's individual order "without further inquiry or regard to his authority or the use of the proceeds of such checks."  *Id.* at 129.  Ferguson stole from the

---

[12] The court relied on 760 ILL. COMP. STAT. 65/2 (2001), which contains language identical to WIS. STAT. § 112.01(3).  *See Mutual Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 624 (7th Cir. 2001).

19

account by drawing numerous checks on the account payable to the bank, then directing the bank to cash each check and give him the proceeds. *Id.* The Appellate Court of Illinois held that "the payment by the bank was to a fiduciary authorized to receive funds from the account" because the broad powers granted to Ferguson under the bank resolution authorized Ferguson "to receive the proceeds of checks he drew payable to the bank." *Id.* at 130. As a result, the UFA "protects the bank against Ferguson's misapplication of the proceeds of the checks." *Id.*

¶43 The Seventh Circuit contrasted Ferguson's authority in *St. Stephen's* to Hemmen's authority in *Elizabeth State Bank*. Whereas Ferguson was authorized by the agreement between the church and the bank to act as he did, Hemmen had no authority to receive the proceeds of checks himself or to divert funds from the operating account to himself. *Elizabeth State Bank*, 265 F.3d at 624-25.

¶44 We now apply those principles to the present case. The complaint describes Tarver's authority with respect to the account:

> Tarver was not an officer of RDM but was a manager with authority to perform financial transactions for RDM and as such, was a signatory on the Account.

Additionally, the agreement attached to the complaint describes the authority of Tarver as a signatory to the account: "any one of you who signs this form including authorized agent signers, may withdraw or transfer all or any part of the account balance at any time on forms approved by us."

¶45 We conclude that Tarver was "authorized to receive" funds from RDM's account under WIS. STAT. § 112.01(3). As established in the *Elizabeth State Bank* and *St. Stephen's* cases, the key consideration is whether Tarver was

authorized to perform the withdrawals and transfers in dispute. *Elizabeth State Bank*, 265 F.3d at 625 ("[W]hat is key is his authority to have funds from the operating account issued to himself."); *St. Stephen's*, 350 N.E.2d at 1024. Here, Tarver's authority is akin to the fiduciary's authority in *St. Stephen's* rather than in *Elizabeth State Bank*. To repeat, the account agreement RDM entered into authorizes signatories to the account—including Tarver—to "withdraw or transfer all or any part of the account balance at any time." This language indicates that Tarver had wide latitude to withdraw or transfer funds from the account, including to himself.

¶46    RDM contends that the UFA only applies when a bank knows the transacting party is a fiduciary and that Royal Bank did not know that it was interacting with a fiduciary because Royal Bank "knew only that the drawer was PayPal, and did not know that Tarver was behind the curtain pulling the strings." RDM attempts to support this argument by referencing the prefatory note to the UFA which states that "the Act covers situations which arise where one person deals with another person whom he knows to be a fiduciary."[13]    *See* UNIF. FIDUCIARIES ACT, notes on Uniform Fiduciaries Act (UNIF. L. COMM'N 1922). We reject RDM's argument for the following reasons. From a factual standpoint, there is no allegation in the complaint that Royal Bank was unaware of Tarver's involvement with the PayPal transactions. Indeed, as we noted earlier, the

---

[13] We note that the language from the prefatory note to the UFA is not codified in WIS. STAT. § 112.01. Nevertheless, when a Wisconsin statute corresponds to a uniform law, "we may consider the official and published comments of the drafters of the uniform law." *Hunt Club Condos., Inc. v. Mac-Gray Servs., Inc.*, 2006 WI App 167, ¶16, 295 Wis. 2d 780, 721 N.W.2d 117 (citing *State v. Mueller*, 201 Wis. 2d 121, 141, 549 N.W.2d 455 (Ct. App. 1996)); *see also Bolger v. Merrill Lynch Ready Assets Tr.*, 143 Wis. 2d 766, 774-75, 423 N.W.2d 173 (Ct. App. 1988) (referencing the prefatory note to the UFA).

complaint is read to state that, at least in some instances, the information in Royal Bank's "transaction detail reports" would have allowed Royal Bank to infer that the money transferred from the account to PayPal would go to Tarver's own personal accounts and Tarver's third-party vendors and creditors. On a motion to dismiss, we cannot add facts in the process of construing a complaint. *Cattau*, 386 Wis. 2d 515, ¶5. Further, the UFA's prefatory note states only that the UFA applies with certainty when a person deals with a known fiduciary. This language sets forth the ordinary situation covered by the UFA, but it does not preclude the application of the UFA when a bank does not know it is dealing with a fiduciary. *See Springfield Twp. v. Mellon PSFS Bank*, 889 A.2d 1184, 1192 (2005) ("[E]ven if the UFA was designed to allow a bank to dispense with formalities when it knows it is dealing with a fiduciary, this does not [mean that] where a bank does not know it is dealing with a fiduciary, it has no defense under the UFA."). Moreover, as discussed earlier, whether a fiduciary is "authorized to receive" funds from the account depends on the fiduciary's *actual* authorization to receive funds, not the bank's *perception* of the fiduciary's authorization. *See id.* at 1191 n.10 ("Personal inquiry by a teller before accepting a deposit is less significant than a generation ago, reinforcing our conclusion that actual authority is more important than perceived authority.").

¶47 Accordingly, Tarver was "authorized to receive" funds from the account within the meaning of WIS. STAT. § 112.01(3).

¶48 In sum, the provisions of the UFA apply to the allegations in RDM's complaint regarding the transfers and withdrawals made by Tarver from the account, including the allegations in the complaint's second cause of action.

## C. RDM's Second Cause of Action Fails to State a Claim.

¶49     We have determined that the provisions of the UFA apply to RDM's second cause of action.  That cause of action is based on Royal Bank's purported negligence concerning the transactions in dispute.  RDM's second cause of action fails under the UFA to the extent that claim sounds in negligence.  *See* WIS. STAT. § 112.01(1)(c), (3); *see also* **Koss Corp. v. Park Bank**, 2019 WI 7, ¶¶31, 86, 385 Wis. 2d 261, 922 N.W.2d 20.  However, RDM argues in the alternative in this appeal that, if the UFA bars its second cause of action based on negligence, RDM has still pled sufficient facts in that second cause of action to state a claim that Royal Bank did not act in "good faith" under § 112.01(3) in these circumstances. Sec. 112.01(3) ("A person who in good faith pays or transfers to a fiduciary any money … which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary.").   We take up RDM's alternative argument because, "[i]n order to satisfy WIS. STAT. § 802.02(1)(a), a complaint must plead facts, which if true, would entitle the plaintiff to relief." **Data Key**, 356 Wis. 2d 665, ¶21.  Royal Bank responds that the allegations in RDM's complaint do not state a claim that Royal Bank failed to act in "good faith" under § 112.01(3).[14]

---

[14] RDM contends that the UFA is an affirmative defense and that RDM is not required to "disprove" an affirmative defense in response to a motion to dismiss.  This argument is incorrect. A court may grant a motion to dismiss based on an affirmative defense if the applicability of the defense is "apparent from the face of the complaint."  **Energy Complexes, Inc. v. Eau Claire Cnty.**, 152 Wis. 2d 453, 463 n.7, 449 N.W.2d 35 (1989) (quoting 2A J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice*, ¶12.07 at 12-68 to 12-69 (2d ed. 1989)); *see also* **C.L. v. Olson**, 143 Wis. 2d 701, 706-07, 422 N.W.2d 614 (1988).  Here, the applicability of the UFA as a defense is apparent from the face of RDM's complaint.  RDM alleged that Royal Bank is liable under common law negligence and the purpose of the UFA is to "provide relief from the dire consequences of the common law rule" that placed on banks and others "dealing with fiduciaries the duty to assure that fiduciary funds were properly applied to the account of the principal." **Bolger**, 143 Wis. 2d at 774; *see also* **Koss**, 385 Wis. 2d 261, ¶¶26, 88.  Further, RDM is not

(continued)

¶50    We begin by establishing the meaning of "good faith" under WIS. STAT. § 112.01(3).

### 1. The "Good Faith" Standard.

¶51    The definition of "good faith" as used in the UFA is supplied by statute: "A thing is done 'in good faith' within the meaning of this section, when it is in fact done honestly, whether it be done negligently or not." WIS. STAT. § 112.01(1)(c). The parties have not identified—and our research has not revealed—Wisconsin case law that analyzes the meaning of "good faith" under § 112.01(3).

¶52    Subpart (3) of WIS. STAT. § 112.01—the subpart at issue in this appeal—is the only subpart in § 112.01 that uses the phrase "good faith"; all of the remaining subparts of the UFA use the phrase "bad faith," which is not defined in § 112.01. In *Koss*, our supreme court addressed the meaning of "bad faith" under § 112.01(9).[15] *Koss*, 385 Wis. 2d 261, ¶27. A two-justice plurality of the court in the lead opinion stated that "'bad faith' is inconsistent with the statutory criteria

---

required to "disprove" the applicability of the UFA in its complaint. Rather, RDM must demonstrate that the allegations in the complaint sufficiently state a claim that the UFA does not bar.

[15] WISCONSIN STAT. § 112.01(9) states in relevant part:

> **(9) Deposit in name of principal.** If a check is drawn upon the account of a fiduciary's principal in a bank by a fiduciary, who is empowered to draw checks upon his or her principal's account, the bank is authorized to pay such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith.…

for 'good faith.'" *Id.*, ¶73. A three-justice concurrence in *Koss* recognized, but did not reject, that proposition stated in the lead opinion. *Id.*, ¶81 (A.W. Bradley, J., concurring). Indeed, the standard adopted by the *Koss* concurrence draws a clear distinction between "bad faith" and negligence, and negligent conduct comes within the definition of "good faith" if such conduct is done "honestly." *Id.*, ¶¶86-87; *New Jersey Title Ins. Co. v. Caputo*, 163 N.J. 143, 748 A.2d 507, 514 (2000); *see* § 112.01(1)(c). In addition, in briefing in this court, both RDM and Royal Bank embrace the statement in the lead opinion in *Koss* that "bad faith" is inconsistent with "good faith" as those phrases are used in the UFA. We thus look to the *Koss* court's discussion of "bad faith" to guide our analysis of § 112.01(3).

¶53 Koss sought to hold Park Bank liable for the funds stolen by Sachdeva, Koss's Vice President of Finance. *Koss*, 385 Wis. 2d 261, ¶6. Sachdeva was authorized to conduct transactions from Koss's accounts at Park Bank. *Id.* Sachdeva embezzled funds from these accounts by ordering cashier's checks and petty cash requests from Koss's Park Bank accounts, then directing other Koss employees to go to the bank to pick up the checks. *Id.*, ¶¶8-13. Koss sued Park Bank under WIS. STAT. § 112.01(9), alleging that Park Bank's transactions with Sachdeva were done in bad faith. *Id.*, ¶¶27-29.

¶54 Five justices in *Koss* agreed that Koss failed to prove bad faith under WIS. STAT. § 112.01(9). The two-justice lead opinion expressed the view that bad faith is an "intentional tort" that requires an analysis of a bank's actions to determine its "subjective intent," and "a claimant who shows bank dishonesty will be successful" in proving that a bank acted in bad faith. *Koss*, 385 Wis. 2d 261, ¶¶53, 54. Acts evidencing bank dishonesty include "a bank willfully failing to further investigate compelling and obvious known facts that suggest fiduciary misconduct because of a deliberate desire to evade knowledge of fiduciary

25

misconduct." ***Id.***, ¶55 (citing ***Trenton Tr. Co. v. Western Sur. Co.***, 599 S.W.2d 481, 492 (Mo. 1980)).

¶55    In the ***Koss*** concurrence, three justices applied a "less exacting" (for a plaintiff) standard that would not require "willful" or "deliberate" actions on the part of the bank:

> [B]ad faith denotes a reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary. It is not established by negligent or careless conduct or by vague suspicion. Likewise, actual knowledge of and complicity in the fiduciary's misdeeds is not required. However, where facts suggesting fiduciary misconduct are compelling and obvious, it is bad faith to remain passive and not inquire further because such inaction amounts to a deliberate desire to evade knowledge.

***Koss***, 385 Wis. 2d 261, ¶¶86-87, 90 (A.W. Bradley, J., concurring) (quoting ***Caputo***, 748 A.2d at 514). Under this standard, "[n]either 'the amount and number of transactions carried out on an account containing fiduciary funds, nor the mere names of payees on checks drawn on that account, are sufficient to create bad faith liability based on the bank's action in paying such checks.'" ***Id.***, ¶91. The ***Koss*** concurrence concluded that the facts did not "present the 'compelling and obvious' suggestion of fiduciary misconduct so as to foist liability onto Park Bank." ***Id.***, ¶92.

¶56    We acknowledge that neither the lead opinion nor the concurrence in ***Koss*** has binding precedential value.[16] Regardless, we must apply an articulable

---

[16] When examining a divided opinion of the Wisconsin Supreme Court to determine its holding, "a majority of the participating [justices] must have agreed on a particular point for it to be considered the opinion of the court." ***State v. Elam***, 195 Wis. 2d 683, 685, 538 N.W.2d 249 (1995) (citing ***State v. Dowe***, 120 Wis. 2d 192, 194-95, 352 N.W.2d 660 (1984) (Per Curiam)); *see also* ***Doe v. Archdiocese of Milwaukee***, 211 Wis. 2d 312, ¶38 n.11, 565 N.W.2d 94 (1997).

standard in our analysis. For the following reasons, in analyzing whether RDM has sufficiently pled that Royal Bank did not act in good faith, we apply the standard for bad faith from the *Koss* concurrence. We agree with the *Koss* concurrence that the legislature has, in the context of the UFA, stated that pursuant to WIS. STAT. § 112.01(14), "our state's UFA 'shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.'" *Koss*, 385 Wis. 2d 261, ¶82. The standard for bad faith enunciated in the *Koss* concurrence has been adopted in more jurisdictions than the standard adopted in the *Koss* lead opinion, and that militates strongly toward using those principles. *See id.*, ¶¶85-86. We next consider the allegations of RDM's complaint in light of that standard.

### 2. The Complaint Fails to State a Claim That Royal Bank Did Not Act in "Good Faith."

¶57    RDM argues that the following facts stated in the complaint—if taken as true—show that Royal Bank did not act in "good faith." We address in turn each of three categories of facts relied on by RDM. For the following reasons, we conclude that RDM's complaint does not allege "compelling and obvious" facts suggesting fiduciary misconduct. *See id.*, ¶86. Therefore, the complaint fails to state a claim sufficient to defeat Royal Bank's affirmative defense under WIS. STAT. § 112.01(3).

¶58    First, according to RDM, Royal Bank did not address the "red flags" regarding the details of the transactions. The complaint described these "red flags" as follows:

> a. Tarver's numerous, electronic debits described as "PayPal transfers" in random, large amounts;

27

b. Tarver's numerous electronic debits in which Tarver's own name was entered in the "customer" field instead of RDM's, and two in which his father's name appeared in the company field (and then were used to pay down the balance on his own credit card);

c. Tarver's numerous electronic debits for which the "WEB" code was entered in the transaction field, including transfers from RDM's operating account to the PayPal account Tarver had set up;

d. Tarver's numerous electronic debits for which his own name was entered in the "receiver" field for large amounts being transferred from Royal to RDM's PayPal account.

e. Payments to various vendors and creditors whose titles and functions would suggest they are not normally payees of a loudspeaker component factory.

Most of these allegations merely describe the amount and number of transactions or the identities of the recipients of those transactions. *See id.*, ¶91 ("Neither 'the amount and number of transactions carried out on an account containing fiduciary funds, nor the mere names of payees on checks drawn on that account, are sufficient to create bad faith liability based on the bank's action in paying such checks.'"). As examples, the fact that there were "numerous" electronic debits describes the "amount and number of transactions," while the fact that payments went to unusual payees for RDM describes the "names of payees" for funds drawn from the account. *See id.*

¶59 RDM argues that the allegations go beyond the number, amounts, and identities of the recipients of the transactions because these allegations concern "the <u>nature</u> of the transactions as well as Royal's <u>awareness</u> of these facts." In particular, RDM highlights the "WEB" code entered in the transaction field, "the use of PayPal as a regular intermediary for personal transactions," and Tarver's use of his own name and his father's name in certain transaction fields.

28

But, none of these allegations are "compelling and obvious" facts suggesting fiduciary misconduct. *See id.*, ¶86. The complaint does not explain—or otherwise provide facts suggesting—why the presence of "WEB" codes on the transactions, Tarver's use of PayPal as a regular intermediary, or Tarver's use of personal names in certain transaction fields indicates that Tarver engaged in fiduciary misconduct.

¶60    Further, even if we would accept RDM's characterization of these facets of the transactions as "unusual" or "suspicious," we would still conclude that that these allegations fall short of "compelling and obvious" facts suggesting fiduciary misconduct. *See id.* (stating that bad faith is not established by "vague suspicion"); *see also Johnson v. Citizens Nat'l Bank*, 334 N.E.2d 295, 300 (Ill. App. Ct. 1975) (In the context of the UFA, "[m]ere suspicious circumstances are not enough to require the Bank to inquire.").[17]

¶61    Second, Royal Bank's employee's knowledge and an assistant branch manager's suspicions about Tarver do not establish that Royal Bank did not act in good faith. The complaint specifically alleges:

---

[17] RDM contends that any potential dispute over the characterization of the transactions is a fact question that should be decided by a jury or at the summary judgment stage. But, on a motion to dismiss, we consider only facts set forth in the complaint. *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶19, 356 Wis. 2d 665, 849 N.W.2d 693. If the facts do not sufficiently state a claim for relief, then the case should be dismissed before the case proceeds to the discovery phase or the jury. *See Doe v. Archdiocese of Milwaukee*, 2005 WI 123, ¶36, 284 Wis. 2d 307, 700 N.W.2d 180 ("It is not enough for the plaintiff to contend that the requisite facts will be 'supplied by the discovery process.'"); *see also Beedie v. Associated Bank Ill.*, 2012 WL 13005591, at*7 (C.D. Ill. 2012) (In the context of the UFA, "[t]o allow discovery—even limited discovery—when a plaintiff has not made sufficient allegations of bad faith or knowledge of wrongdoing would result in a shifting of the burden away from principals and onto banking institutions. This would be a clear contravention of legislative intent.").

> After the fraud was discovered, when [RDM's owner] pointed out a telephone number that was entered in the "receiver" field of an electronic debit transaction, [the assistant branch manager], whose husband works at RDM, left to check the number in the telephone book, saw that it was Tarver's and said she'd "had a hunch" and was "not surprised."

As explained above, the purported "red flags" are not "compelling and obvious," so the employees' awareness of Tarver's activities does not establish bad faith. More particularly, any suspicions of the assistant branch manager do not alter this conclusion. The assistant branch manager's statements that she had a "hunch" and was "not surprised" are nothing more than "vague suspicion" that do not amount to a lack of good faith. *See* ***Koss***, 385 Wis. 2d 261, ¶86 (A.W. Bradley, J., concurring).

¶62 Finally, RDM argues that Royal Bank's failure to monitor RDM's other accounts establishes a lack of good faith. In that regard, the complaint states:

> Even after [RDM's owner] informed Royal of the fraud, Royal did not monitor RDM's payroll account for additional unauthorized debits, claiming later that [RDM's owner] had only told them to watch RDM's operating account. This allowed another individual, who was not an RDM employee, to accomplish additional thefts from the payroll account after stealing the account information from RDM.

These facts are unrelated to Tarver's fiduciary misconduct and Royal Bank's alleged passivity in the face of "compelling and obvious" facts. As the circuit court correctly pointed out: "This information appears factually unrelated to the dispute between these parties over Mr. Tarver's conduct, and would likely be ruled inadmissible at trial." We agree.

¶63 In sum, RDM's complaint does not state facts that are sufficiently "compelling and obvious" to show Royal Bank's lack of good faith under WIS. STAT. § 112.01(3). Therefore, RDM's second cause of action was properly dismissed by the circuit court without prejudice with RDM given the opportunity to file another complaint to allege Royal Bank's purported failure to act in good faith under § 112.01(3).[18]

## CONCLUSION

¶64 For the foregoing reasons, the order of the circuit court is affirmed. The complaint is dismissed without prejudice to RDM's request after remittitur to amend the complaint regarding both breach of contract and Royal Bank's purported failure to act in good faith under WIS. STAT. § 112.01(3).

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.

---

[18] RDM also disputes the propriety of the circuit court's reference to WIS. STAT. § 404.406 and discusses at length the "current expectations of bank security procedures" under the UCC's commercial reasonableness standard. We need not reach these issues because our discussion of bad faith under the UFA is sufficient to resolve RDM's appeal.